UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

FILED

16 SEP 19 PM 2: 16

FOR THE ... DISTRICT
OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) No. 1:16-cr-04 |
| FRED WITMER | ) |
| | ) |

## INFORMATION

The Assistant Attorney General for the Environment and Natural Resources Division of the U.S. Department of Justice charges that at all times material to this Information, in the Northern District of Indiana, and elsewhere:

### GENERAL ALLEGATIONS

*Persons and Business Entities*

1.     Triton Energy LLC ("Triton") was a registered Indiana Limited Liability Company located at 205 Industrial Parkway, Waterloo, Indiana.

2.     Gen2 Renewable Diesel LLC ("Gen2 LLC") was a registered Indiana Limited Liability Company located at 205 Industrial Parkway, Waterloo, Indiana.

3.     Defendant FRED WITMER was a resident of Indiana, who has served as the President and co-owner of Triton and Gen2 LLC.

4.     Triton operated a production plant that claimed to process animal fats and vegetable oils ("feedstock") into renewable fuel. This was accomplished through a "proprietary" process referred to as "the Triton Process," which involved mixing feedstock with alcohol and a

"proprietary" catalyst in a "high shear and temperature" environment. Triton called the resulting product Gen2 Renewable Diesel ("Gen2").

*Renewable Fuel and Renewable Identification Numbers*

5.      The Energy Policy Act of 2005 (Pub.L. 109-58) and the Energy Independence and Security Act of 2007 (Pub.L. 110-140) ("EISA") required the U.S. Environmental Protection Agency ("EPA") to establish a program to encourage the production and use of renewable fuels in the United States.

      a.      "Renewable fuel" is defined, in part, as a fuel produced from renewable biomass that is used to reduce or replace the quantity of fossil fuel in transportation fuel, heating oil, or jet fuel. "Renewable biomass" included things like crops, algae, and food waste.

6.      In response to these directives, the EPA established the Renewable Fuels Standard ("RFS"). Under the RFS, from May 2007 through the present, petroleum refiners and importers (known as "obligated parties") have been required by federal law to have a designated amount of renewable fuel in their product portfolios each year. Obligated parties could fulfill this requirement by producing the renewable fuel itself or they could obtain tradeable credits based on renewable fuel produced by others.

7.      These credits are called "renewable identification numbers" or "RINs." RINs are generated when a registered renewable fuel producer produces a qualifying fuel in compliance with EPA regulations. Initially, RINs are "assigned" to renewable fuel and must be transferred with the fuel whenever the fuel is transferred. If ownership of fuel with assigned RINs changes, so does ownership of the RINs.

8.      Under certain circumstances, an owner of fuel with assigned RINs could "separate" the RINs from the underlying volume of fuel. After separation, the RINs could be bought and sold without buying and selling the associated fuel.

9.      Any entity separating RINs had to provide EPA with an explanation for separating the RINs from the fuel (termed the "separation code" or "separation reason"). Many of these explanations related to the required end uses of the fuel. Examples of separation codes include (1) "blend[ing] [the renewable fuel] with gasoline or fossil-based diesel to produce a transportation fuel" and (2) "designat[ing] the neat renewable fuel or blend as heating oil [and] us[ing] [the renewable fuel] without further blending, in the designated form, as heating oil."

10.     Since July 1, 2010, all RIN transactions are handled through the electronic EPA Moderated Transaction System ("EMTS"). In EMTS, all RIN transactions (such as RIN generations, RIN separations, and RIN transfers) are recorded electronically, using an on-line platform. In order to use EMTS, registered parties must create a unique account with the Central Data Exchange ("CDX") through which all EMTS transactions are logged.

11.     In order to transfer a RIN, whether assigned or separated, the transferring party must provide a Product Transfer Document ("PTD") containing information about the RINs being transferred.

12.     There are also reporting and record-keeping requirements for all companies generating RINs. As of July 1, 2010, any RIN-generating producer must keep, among other records, all product transfer documents, copies of reports submitted to EPA, and records related to each RIN transaction, for five years.

*Tax Credits*

13.    The EISA also tasked the Internal Revenue Service with encouraging the

production and use of renewable fuels. In particular, it tasked the IRS with administering tax

credits associated with the production of various renewable fuels and fuel mixtures.

    a.    The Alternative Fuel Credit ("AFC" or "AF Credit"), 26 U.S.C. § 6426(d),

       entitles registered claimants to a 50 cent tax credit for every gallon of alternative

       fuel sold for use in a motor vehicle or motorboat, provided they comply with

       additional regulatory requirements.

14.    Tax credits could only be claimed on a given quantity of fuel one time.

15.    Many of the tax credits created by the EISA are refundable, meaning that they can

reduce a registered recipient's excise tax liability below zero, entitling them to a refund, or

payment, from the IRS.

16.    Since their inception, several of these tax credits have expired only to be later

reinstated. For instance, the AFC lapsed at the end of 2011, only to be subsequently reinstated by

the American Taxpayer Relief Act of 2012 (Pub.L. 112-240) in early 2013. The American

Taxpayer Relief Act also allowed registered companies to apply for retroactive credits for

qualifying activities in 2012.

### Count 1
### Wire Fraud
### 18 U.S.C. § 1343

17.    Paragraphs 1-16 are realleged and expressly incorporated herein as if set out in

full.

18.    Beginning no later than in or about March 2010, and continuing thereafter until at

least in or about December 2011, in the Northern District of Indiana and elsewhere, Defendant

FRED WITMER, and others known and unknown to the United States executed a scheme or artifice to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, which they had previously devised among themselves and others known and unknown to the United States; in violation of 18 U.S.C. § 1343;

19.     As part of the scheme, Defendant FRED WITMER, and others known to the United States, caused Triton to knowingly sell processed corn oil (sometimes referred to as "Gen2") to various customers for uses other than heating oil, transportation fuel, or jet fuel.

   a. Defendant FRED WITMER caused Triton to sell processed corn oil for use as a lubricant in the production of the wood pellets to a producer based in Michigan (hereinafter "MI Producer").

   b. Defendant FRED WITMER caused Triton to sell processed corn oil to a broker based in Michigan (hereinafter "MI Broker"). Triton shipped the material directly to MI Broker's customer in Painseville, Ohio, for use in producing a wax that would ultimately be used to produce fire starter logs.

20.     As part of the scheme, Defendant FRED WITMER caused Triton to utilize EPA's online EMTS platform to execute the scheme to defraud:

   a. Defendant FRED WITMER caused Triton to generate RINs in EMTS on gallons of Gen2 sold to MI Producer and MI Broker for uses other than transportation fuel, heating oil, or jet fuel.

   b. Defendant FRED WITMER caused Triton to separate the RINs generated on gallons of Gen2 in EMTS using false and fraudulent separation reasons and separation codes indicating the fuel had been sold for use as heating oil and transportation fuel.

     c.  Defendant FRED WITMER caused Triton to fraudulently sell the separated RINs to third parties in EMTS.

21.    As part of the scheme, Defendant FRED WITMER caused Triton to invoice the purchasers of their Gen2, including MI Broker and MI Producer, causing the use of interstate wire transfers to send money from the Gen2 purchasers to Triton.

22.    As part of the scheme, Defendant FRED WITMER caused Triton to invoice the purchasers of these RINs, causing the use of wire transfers in interstate commerce to send money from the RIN purchasers to Triton.

     a.  Between March 2011 and December 2011, Triton received payments totaling approximately $24,348,000 via wire transfer for these RINs.

     b.  Among other wire transfers in furtherance of the scheme, on or about September 14, 2011, following receipt of a Triton invoice for RINs, a third-party purchaser sent a wire transmission of $891,250.00 in interstate commerce to Triton's bank account in Indiana.

23.    As part of the scheme, Defendant FRED WITMER, and others known to the United States, facilitated the scheme by altering documents, and ordering Triton employees to alter documents, including invoices, after they had been issued. These altered documents were provided to third-party auditors and to an accountant performing an EPA-mandated annual attestation.

### Count 2
### Conspiracy to Commit Criminal Offenses
### 18 U.S.C. § 371

24.    Paragraphs 1-16 are realleged and expressly incorporated herein as if set out in full.

25.     Beginning at a time unknown to the United States, but not later than in or about

March 2012, and continuing thereafter until a time unknown to the United States, but not earlier

than in or about March 2015, in the Northern District of Indiana and elsewhere, Defendant

FRED WITMER, did knowingly and willfully combine, conspire, confederate, and agree with

Gary Jury and others known and unknown to the United States to commit offenses against the

United States; specifically, they conspired to:

      a.  transmit and cause to be transmitted by means of wire and radio communication

          in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

          for the purpose of executing a scheme and artifice to defraud, and for obtaining

          money and property by means of false and fraudulent pretenses, representations,

          and promises, in violation of 18 U.S.C. § 1343; and

      b.  make and present claims, specifically claims for the Alternative Fuel Credit, upon

          and against the United States and the IRS, knowing such claims to be false,

          fictitious, and fraudulent, in violation of 18 U.S.C. § 287.

### Means and Methods of the Conspiracy

The conspirators used the following means and methods to carry out the conspiracy and

achieve its unlawful objects, among others:

*RINs*

26.     Beginning in March 2012, FRED WITMER and Gary Jury agreed to sell loads of

Gen2 (and assigned RINs) to Company A, a fuel broker based in New York operated by Co-

conspirator A. FRED WITMER and Gary Jury also agreed to purchase feedstock from Company

B, another New York entity operated by Co-conspirator A. These transactions involved the use of interstate wire transfers of money between Triton and Company A and Company B.

27.    The Gen2 fuel needed to be used as transportation fuel. However, after RINs had been generated on this Gen2, Company A sold the fuel for a variety of non-qualifying uses, including as heating oil and to fuel power plants and cement kilns. Consequently, any RINs that were generated were illegitimate, could not be used for compliance, and would need to be retired.

28.    From in or about March 2012, until no earlier than in or about March 2015, Company A sold the illegitimate RINs (totaling approximately 41,100,000 RINs) to a Texas broker under false and fraudulent pretenses for approximately $31,800,000.

*Tax Credits*

29.    Following the passage of the American Taxpayer Relief Act of 2012 on or about January 1, 2013, Defendant FRED WITMER, worked in concert with others, including Gary Jury, Co-conspirator A, and others known and unknown to the United States, to claim tax credits—specifically the $.50/gallon Alternative Fuel Credit—for Gen2 fuel sold to Company A.

30.    As of January 1, 2013, Triton was not registered to claim AF Credits. However, another entity based in Pasco, Washington, with whom Triton had previously done business ("Company C"), was registered to claim AF Credits. Therefore, on or about February 27, 2013, Defendant FRED WITMER, Gary Jury, Co-conspirator A, and others known and unknown to the United States, worked in concert to have Company C falsely claim retroactive AF Credits for Gen2 fuel Triton had actually sold to Company A between October 2012 and February 2013.

31.    To facilitate the scheme, the parties created a series of contracts and invoices to suggest that the fuel in question had been sold by Triton to Company C rather than Company A. Company C then created invoices suggesting it sold the fuel to Company A.

32.    Subsequently, between on or about March 1, 2013, and on or about May 20, 2013, as Triton was waiting for its IRS registration to process, Triton sold loads of fuel as it was produced to Company C (on paper), who then claimed AF Credits on it before selling it to Company A (on paper). Throughout this time, the fuel continued to be shipped directly from Triton to Company A's customers, and was not sold for use in motor vehicles or motorboats.

33.    On or about May 21, 2013, Triton received the registration necessary to begin claiming AF Credits. As a result, Triton no longer needed Company C to claim AF Credits. Thereafter, Triton began selling Gen2 directly to Company A and claiming AF Credits itself.

34.    Between on or about May 30, 2013, and December 31, 2013, Triton requested and received approximately $4,852,440 in AF Credits for fuel sold to Company A that was not used (or sold for use) in motor vehicles or motorboats:

35.    . The proceeds from these tax credits were shared with Co-conspirator A, Company A, and Company B by including them in the amount Triton paid for feedstock or charged for fuel.

36.    After obtaining approval to claim AF Credits, Triton requested retroactive AF Credits for the first three quarters of 2012. This request was for $2,470,001.00, representing 4,940,002 gallons of fuel sold to Company A during this period. Of this, $1,235,000.50 was due to Co-conspirator A and Company A pursuant to a previous agreement to share any such credits equally.

37.     After Triton received this money, Company B sent Triton false invoices for $408,108.00, $437,392.00, and $397,500.50 (totaling $1,235,000.50) purporting to be for "exceeding feedstock requirements." These transactions were designed to conceal and disguise the true reason for the payment – the transfer to Company A and Co-conspirator A of their portion of the falsely-claimed tax credit.

### Overt Acts

38.     In furtherance of the conspiracy, and to accomplish the objectives of the conspiracy, Defendant FRED WITMER and others did commit the following overt acts, among others, in the Northern District of Indiana and elsewhere:

**Overt Act 1.** On or about March 1, 2012, Fred Witmer sent Co-conspirator A an email with a "proposed PTD [product transfer document] attached." The attached document was an invoice from Triton to GRC for the sale of Gen2 Renewable Diesel, and included the statement "Designated for an Additive in #2 Heating Oil."

**Overt Act 2.** On or about March 26, 2012, Co-conspirator A wrote an email to Gary Jury requesting, "On the bottom of the document, I would have Fred remove the comment relating to Diesel #2 and state 'for MVNRLM [motor vehicle, non-road, locomotive, marine] diesel fuels limited to <5% Motor Vehicle diesel fuel use.'"

**Overt Act 3.** On or about March 12, 2012, Fred Witmer and Co-conspirator A exchanged emails outlining arrangements for Triton to purchase feedstock from Company B, and sell Gen2 to Company A. They also agreed that "if the tax credit comes back, we split that 50/50."

**Overt Act 4.** On or about November 15, 2012, Co-conspirator A signed a statement falsely stating that Triton's fuel met #4 specifications and was sold for use in NRLM (i.e. nonroad, locomotive, marine) applications.

**Overt Act 5.** Throughout 2012, Company A continued to sell the illegitimate RINs to a broker under false pretenses. Company A sold these RINs approximately 51 times (for approximately $9,800,000).

**Overt Act 6.** On or about February 27, 2013, and on or about March 11, 2013, Fred Witmer, Co-conspirator A, and others known and unknown to the United States participated in conference calls to discuss claiming the Alternative Fuels Credit retroactively.

**Overt Act 7.** On or about March 11, 2013, Gary Jury produced a series of spreadsheets detailing how Triton's sales of Gen2 fuel to GRC between March 2012 and February 2013 would be transformed into sales of the same material to Company C.

**Overt Act 8.** On or about May 23, 2013, after receiving the necessary registration from the IRS, Defendant FRED WITMER signed an IRS Form 8849 requesting Alternative Fuel Credits totaling $2,470,001.00, representing 4,940,002 gallons of fuel sold to Company A between January 1, 2012, and September 30, 2012.

**Overt Act 9.** On or about July 6, 2013, after Triton received a check from the U.S. Treasury for $2,470,001.00, FRED WITMER and Co-conspirator A spoke and agreed to characterize the money exchanged as a fictitious feedstock rebate.

**Overt Act 10.** Between on or about July 9, 2013, and on or about July 10, 2013, Company A sent false invoices to Triton for $408,108.00, $437,392.00 and $397,500.50 pursuant to the arrangement set out in Overt Act 8. The invoice descriptions read "Payment for exceeding feedstock requirements for 18 month period ending June 30, 2013."

**Overt Act 11.** Throughout 2013, Company A continued to sell the illegitimate RINs generated on this fuel under false pretenses.

**Overt Act 12.** Throughout 2014, Company A continued to sell the illegitimate RINs generated on this fuel under false pretenses.

**Overt Act 13.** Until no earlier than March 31, 2015, Company A continued to sell the illegitimate RINs generated on this fuel under false pretenses.

All in violation of 18, United States Code, Section 371.

JOHN CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

by:

Adam Cullman
Trial Attorney
United States Department of Justice

Jeremy F. Korzenik
Senior Trial Attorney
United States Department of Justice